Norlin O. BACKMAN, for himself and all others similarly situated, Plaintiff,

v.

William L. GUY, Governor, Math Dahl, Commissioner of Agriculture and Labor, P. L. Foss, Chairman of the Senate Appropriation Committee, Vernon Anderson, Chairman of the House Appropriation Committee and Ben Meier, Secretary of State, all as members of the Emergency Commission, et al., Defendants.

No. 8137.

Supreme Court of North Dakota.

March 12, 1964.

Gene C. Grindeland, Hatton, for plaintiff.

Helgi Johanneson, Atty. Gen., and Vance K. Hill, Sp. Asst. Atty. Gen., Bismarck, for defendants.

Benson & Rohde, Bottineau, amicus curiae.

TEIGEN, Judge.

This is a proceeding under Chapter 32–24, N.D.C.C., and involves certification of three questions of law to this Court.

The Emergency Commission of the State of North Dakota (Chapter 54–16, N.D.C.C.), during the months of July, September, and November, 1963, made certain allocations out of the State Contingency Fund, the legality of which is challenged by this proceeding for provisional remedy by injunction. The facts were stipulated and the parties joined in a motion for certification of questions of law to the Supreme Court,

which questions were certified by the district court to be in doubt, vital, and principally determinative of the issues in the case.

■ A petition for a temporary restraining order was directed to Judge W. C. Lynch, who is the senior judge of the fourth judicial district. It appears, however, the proceeding in the district court was determined by two district judges acting together. We find no statute or authority in North Dakota providing for a multi-judge district court. No objection was raised to this procedure but we will consider this proceeding as the decision of the senior judge, W. C. Lynch, to whom the proceeding was first presented. We deem the signature of the additional judge as surplusage.

The Emergency Commission made allocations of funds from the State Contingency Fund to the State Laboratories Department for "Salary—director" and to the State Land Department for "Salary—deputy." It also allocated to the Department of Agriculture and Labor a sum for predatory animal and rodent control. All of these allocations were in the same amount as appropriations contained in bills passed by the 1963 Legislative Assembly but which bills, or a line item therein, were vetoed by the Governor and therefore did not become appropriations.

The Emergency Commission also allocated $25,000 to the State Board of Higher Education to be used as matching funds to construct a headquarters and shop building for the North Dakota Forest Service to be constructed at the Bottineau School of Forestry under the Accelerated Public Works Act of September 1962, a federal program. It is stipulated that the county in which the school is located became eligible for benefits under the federal program after the close of the last legislative session. According to the records of the Emergency Commission, application had been made to the Legislature at three different sessions for an appropriation to construct this building but no funds were appropriated for this purpose.

The plaintiff seeks to permanently enjoin the transfer and expenditure of these allocations by the defendants on the ground that the allocations were illegal because they were made for purposes for which no appropriation existed.

The three questions certified to this Court with the district court's answers are as follows:

"1. May the Emergency Commission allocate money from the State Contingency Fund to a board, commission, officer, department or agency of the State of North Dakota for a new purpose, i. e., one which was never covered by or included within a current legislative appropriation, either due to consideration and denial by the legislature, veto by the governor, or failure to consider by the legislature?"

Court's answer: *"No."*

"2. May the Emergency Commission provide the necessary 'new money' to construct a headquarters building for the North Dakota Forest Service when such project was approved as eligible in July, 1963, for a federal grant under the Accelerated Public Works Act of September, 1962, provided that the State allocate a similar amount not previously available for such a project by October 1, 1963? In other words, could such availability of federal funds constitute an emergency as that term is defined by Section 54–16–04 of the North Dakota Century Code?"

Court's answer: *"No."*

"3. Was the Governor's veto of the line item for salary of the Director of the State Laboratories Department valid in view of the fact that the law creating the State Laboratories Department was an initiated measure and Section 25 of the Constitution does not allow the veto power of the Governor to extend to referred or initiated measures?"

Court's answer: *"No."*

The plaintiff takes the position that the statute is clear and does not authorize the allocations in issue. The Attorney General takes the position that the statute is not clear, is ambiguous and uncertain, and should be construed in harmony with departmental practice, Attorney General's opinions and legislative acquiescence, which, he argues, are in harmony with the action taken.

We will now determine the answer to the first question. A State Contingency Fund was established by Chapter 26 of the Session Laws of 1915. This statute is now Section 54-16-08, N.D.C.C. Appropriations have been made to this fund each biennium since its passage. It is subject to the jurisdiction of the Emergency Commission as established by the 1915 Act and amendments thereto.

Section 54-16-01, N.D.C.C., creates the Emergency Commission and determines its membership. It appoints its officers, provides the method of calling its meetings, and further provides that it shall exercise the powers and perform the duties imposed upon it by law.

Section 54-16-02 provides the method by which it shall keep its records.

Section 54-16-03 makes it unlawful for any of the State officials and employees described therein to expend, or agree to contract to expend, any moneys in excess of sums appropriated for any purpose without first having secured from the Emergency Commission an order of authorization.

Section 54-16-04 provides when the Emergency Commission may order a transfer of moneys from one fund to another fund or authorize an allocation from the State Contingency Fund. It reads as follows:

"Whenever it is made to appear to the emergency commission by an itemized, verified petition of any board, commission, or officer authorized to expend public funds that an emergency exists, the emergency commission shall assume that an emergency exists de-

manding such action and may order money transferred from one fund to another fund belonging to or appropriated for the same institution or board or the same state enterprise, or in an extremity may authorize money to be drawn from the state treasury to meet the emergency until such time as the legislative assembly can make an appropriation available therefor. The term 'emergency' shall be limited to calamities or unforeseen happenings subsequent to the time of the making of appropriations to be effected by such transfer and which were clearly not within the contemplation of the legislative assembly and the governor at the time of making such appropriation. The emergency commission shall not increase the amounts to be expended for any specific purpose by more than ten per cent, and this shall be done only to meet a deficiency arising in an attempt to carry out the purpose of the appropriation."

This is the statute which the Attorney General argues is ambiguous and not clear, and which the plaintiff in this case cites to support his contention that the challenged allocations are illegal.

"Words used in any statute are to be understood in their ordinary sense, unless a contrary intention plainly appears, but any words explained in this code are to be understood as thus explained." Section 1-02-02, N.D.C.C.

"Words and phrases shall be construed according to the context and the rules of grammar and the approved usage of the language. Technical words and phrases and such others as have acquired a peculiar and appropriate meaning in law, or as are defined by statute, shall be construed according to such peculiar and appropriate meaning or definition." Section 1-02-03, N.D.C.C.

"When the wording of a statute is clear and free of all ambiguity, the

letter of it is not to be disregarded under the pretext of pursuing its spirit." Section 1-02-05, N.D.C.C.

■ When we analyze this statute, applying the rules of statutory construction, we find it is clear. It provides that whenever it is made to appear to the Emergency Commission that an emergency exists by an itemized, verified petition of any board, commission or officer authorized to expend public funds, it shall assume that an emergency exists demanding the action prayed for in the petition.

If an emergency is found to exist, two courses are open to the Emergency Commission. It may: (1) Order money transferred from one fund to another fund belonging to or appropriated for the same institution or board or the same State enterprise; or (2) In an extremity it may authorize money to be drawn from the State treasury to meet the emergency until such time as the Legislative Assembly can make an appropriation therefor.

■ The word "or" is a conjunction used as a functional word to indicate "an alternative between different or unlike things, states, or actions." Webster's Third New International Dictionary. It is followed by the adverbial phrase "in the extremity" which modifies "may authorize" and means "sole recourse" or "final resort." Webster's Third New International Dictionary. It simply means that if there are no funds that can be transferred from one fund to another within the same institution, board or State enterprise, it may then authorize money to be drawn from the State treasury to meet the *"emergency."* (Emphasis supplied.)

■ The term "emergency" is defined by the statute and this definition must be applied in interpreting the chapter. It states:

"The term 'emergency' shall be limited to calamities or unforeseen happenings subsequent to the time of the making of appropriations to be effected by such transfer and which were clearly not within the contemplation of the legislative assembly and the governor at the time of making such appropriation."

■■ "Calamity" is defined by Webster as "a state of deep distress or misery connected with major misfortune or loss." It is also defined as "an extraordinarily grave event marked by great loss and lasting distress and affliction." "Unforeseen happenings" are the occurrence of events that were not foreseen, the unexpected.

Thus there are two situations provided when an emergency may exist but, in either event, the statute qualifies them when it states they must have occurred subsequent to the time "of the making of appropriations to be effected by such transfer * * *."

The verb "effected" is the past tense of "effect." The word "effect" is a homographic word having distinct derivations and meanings. According to the context of this sentence, it is defined in Webster's Third New International Dictionary as "to bring about esp. through successful use of factors contributory to the result: ACCOMPLISH, EXECUTE * * *—compare AFFECT." A synonym is perform. In Funk and Wagnalls New Standard Dictionary, it is defined as " * * * bring about; accomplish; * * *" Synonyms are accomplish, achieve, do, make and produce. The infinitive phrase "to be effected by such transfer" modifies "appropriations" and designates the appropriation to which a transfer can be made. Breaking the phrase down farther, the word "such" is an adjective and modifies "transfer."

"In its natural and ordinary sense, and by grammatical usage, the word 'such' refers to an antecedent, some antecedent word or phrase, and, more specifically, to the last precedent antecedent, unless the meaning would thereby be impaired. Thus the word 'such' refers back to and identifies something previously spoken of, something that

has gone before, something that has been specified. It always refers to a class just before pointed out, and should be construed as referring back to a common subject matter. It may be used as representing the object as already particularized in terms which are not mentioned, and it may indicate or suggest a person or thing originally specified by a name or designation." 83 C.J.S., Such, Page 771.

The words "such transfer" are descriptive and relate back to the last antecedent, word or phrase. The word "transfer" is defined: "to carry or take from one person or place to another: TRANSPORT * * * to make over or negotiate the possession or control of (a right, title, or property) by a legal process usu. for a consideration: CONVEY." Webster's Third New International Dictionary.

In 87 C.J.S. Transfer Page 892, it states:

"* * * 'transfer' is one of the widest terms that can be used, and that in ordinary use and language it has a very general meaning, and applies either to the removal of a thing or rights from one place or person to another, the changing of the control or possession of things, or to the conveyance of title; and generally the term is broad enough to comprehend any physical movement of an object from one place to another, or from the hands of one person to the hands of another person. * * *

"* * * The word 'transfer,' as a noun, is defined generally as meaning the act of transferring or state of being transferred; a removal or conveyance of a thing from one place to another; the removal or conveyance from one place, person, or thing, to another; transference; transmission."

There are two antecedents to which the words "such transfer" refer. The nearest is "authorize money to be drawn from the state treasury to meet the emergency * * *." This can only be accomplished by a transfer of funds from the State Contingency Fund to the fund or appropriation of the department which will expend the money to meet the emergency. The other is "order money transferred from one fund to another fund" within a department, etc.

The Legislature makes this meaning even more clear by the language that follows. It states: "and which were clearly not within the contemplation of the legislative assembly and the governor at the time of making such appropriation." The pronoun "which" is a functional word used to introduce a restrictive clause and refers to "calamities or unforeseen happenings." The word "such" is an adjective and modifies the word "appropriation" as having a "quality already or just specified." A synonym is "aforementioned." It is used to avoid repetition of a descriptive term. Webster's Third New International Dictionary. The words "such appropriation" are therefore descriptive and relate to the last antecedent, "the making of appropriations to be effected by such transfer * * *."

The statute also states the term "emergency" shall be "limited" which makes it restrictive. The term "emergency" is therefore characterized by the enforceable limitations thereinafter stated. It is given a limited and restricted meaning stated in the context of the definitive sentence. The situation to be considered by the person, who makes the request for an emergency allocation and by the Emergency Commission when it considers the verified petition filed with it, must meet the standards provided by the statutory definition of the term "emergency" before it may be concluded that an emergency exists, which is remedial under the provisions of the Act. These standards are: (1) There must be an existing appropriation; (2) The functions to be performed by the department to meet the emergency must be within the purposes of the appropriation to be affected; (3) The calamities or unforeseen happenings are restricted to areas of governmental function for which an appropria-

tion exists; and (4) The occurrence of the calamities or the unforeseen happenings clearly must not have been within the contemplation of the Legislative Assembly and the Governor when the appropriation was made.

This interpretation is in harmony with another important section of the Act, Section 54-16-09, passed by the 1959 Legislature. It provides that the Emergency Commission shall certify that the material, services, purposes, and other considerations named in the itemized statement of the requirements, are necessary and proper materials to be paid from the Contingency Fund *"and that the appropriation for such purpose is insufficient."* (Emphasis supplied.) This section has direct reference to the State Contingency Fund from which money may be drawn to meet an emergency. The certificate must be filed with the Department of Accounts and Purchases, who shall file the same as authority for issuing the warrant therein directed.

Section 54-16-10, N.D.C.C., provides that no departmental emergency moneys appropriated by the Legislative Assembly to be used for emergency purposes shall be expended until such money so appropriated, or so much thereof as may be necessary, shall have been transferred to the subdivision *"of the regular appropriation"* in which the emergency exists. (Emphasis supplied.) This Act became effective in 1943.

Sections 54-16-09 and 54-16-10 were both adopted subsequent to the original Act of 1915 and indicate legislative definition and intent.

█ The tenor of the whole Act militates against an interpretation allowing the Emergency Commission to allocate moneys to create a new fund or new appropriation.

The intent of the Legislature is made clear when we examine the history of emergency commission legislation. The Emergency Commission first came into existence in 1895. Chapter 23 of the Session Laws of 1895. This Act made it unlawful for any board of trustees, commissioners, directors, person or persons having the control or management of public institutions of the State, or having in any manner whatsoever the responsibility of disbursing or expending any money appropriated by the State, to either directly or indirectly, or in any manner whatsoever, expend or agree to contract to expend, for the use or benefit of any institution or purpose, any amount in excess of the sum appropriated for such institution or purpose. It also prohibited any amount appropriated for any specific purpose or fund to be used for or transferred to any other purpose or fund. It provided an exception, however, in the following words:

"Provided, That when in the belief of any such board, person or persons, an emergency exists, and the interests of the State are jeopardized by reason of the *exhaustion of the amount appropriated, or by cause for which there is no provision of law,* the matter with all relative facts, shall be referred to a commission consisting of the Governor, Secretary of State and State Auditor, who may authorize the transfer of money from one fund to another fund, of the same institution or purpose, or who may in extreme cases authorize money to be drawn from the State treasury to meet the emergency." (Emphasis supplied.)

The salient provisions of this Act, insofar as the question involved in this proceeding is concerned, remained in force for twenty years. Sections 1023 and 1024 of the Revised Code of 1899; Sections 1283 and 1284 of the Revised Code of 1905; Chapter 234 of the Session Laws of 1907; Chapter 159 of the Session Laws of 1913; and Sections 1821 through 1824 of the Compiled Laws of 1913. During all of this time authority existed to allocate from treasury moneys to meet an emergency "by cause for which there is no provision of law, * * *." However, this provision was omitted by the 1915 Legislature when

it repealed the old law and enacted a new law. See Chapter 152, Session Laws of 1915.

The new Act defined "emergency" as follows:

"[T]he term emergency shall be limited to calamities or unforeseen happenings subsequent to the time of the making of appropriations to be effected by such transfer and which were clearly not within the contemplation of the legislative assembly and the Governor at the time of making such appropriation."

■ In view of the history of this law, we believe it establishes the legislative intent to omit from the jurisdiction of the Emergency Commission authority to make allocations to meet an emergency "by cause for which there is no provision of law, * * *." The definition of an "emergency" as contained in the 1915 Act has been continued in force and is now contained in Section 54–16–04, N.D.C.C. The history is in harmony with our interpretation of the language of the Act.

■ The legislative intent is clear. We can see no room for application of the rule of practical construction by the officers charged with the duty of executing the Act as an aid. In re Black's Estate, 74 N.D. 446, 23 N.W.2d 35.

We find the district court correctly answered the first question.

■ As to the second question, it is stipulated that an appropriation to the Board of Higher Education for use in constructing the building alluded to at the State School of Forestry was considered by the Legislature but no appropriation was ever made for that purpose. Therefore, it too must be answered in the negative. The fact that the federal government makes available to the State federal money which may be used by the State on a matching basis does not come within the definition of the term "emergency" as defined by the statute.

■ We come now to question numbered three which asks us to decide whether or not the Governor's veto of a line item for salary of the director of the State Laboratories Department is valid. It was stipulated that the State Laboratories Department, including the position of director, was created by an initiated measure in 1938 and that the State Legislature amended this law on two subsequent occasions by the necessary two-thirds vote. It first modified the amount of salary payable to its director and, finally, the 1949 Legislature amended this provision to provide that the director shall receive an annual salary in such amount as appropriated therefor by the Legislative Assembly. The question does not involve a situation whereby the Emergency Commission ordered an allocation of additional funds or moneys for salary payment to the director but an order for a transfer of funds from the State treasury for the full amount thereof because no appropriation was made. Thus there is no "such appropriation" in existence upon which the Emergency Commission may premise jurisdiction. The Governor's veto of the salary appropriation made by the Legislative Assembly, if valid, resulted in no appropriation being made. If the Governor's veto was ineffective because it is invalid, there is no emergency because no claim is made that the amount appropriated is insufficient. The question of the validity of the Governor's veto is clearly not an issue in this proceeding.

We have said the statute allowing certified questions does not contemplate the giving of advisory opinions. Ullman v. Campbell, 51 N.D. 198, 199 N.W. 482; Minnkota Power Co-op v. Kyser, 78 N.D. 102, 48 N.W.2d 34. We decline to answer the third question.

The case is remanded for further proceedings conformable to law.

MORRIS, C. J., and STRUTZ, ERICKSTAD and BURKE, JJ., concur.